1          UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

3       HONORABLE JESUS G. BERNAL, U.S. DISTRICT JUDGE

4

5   UNITED STATES OF AMERICA,        )
                                     )
6                                    )
                PLAINTIFF,           )   Case No.
7                                    )
             vs.                     )   EDCR 13-00073-JGB
8                                    )
    THERON CHARLES BARRON,           )   Appeal No. 14-50588
9                                    )
                DEFENDANT.           )
10  _____)

11

12                  REPORTER'S TRANSCRIPT
                 MONDAY, NOVEMBER 10, 2014
13                      2:00 P.M.
                  RIVERSIDE, CALIFORNIA

14

15

16

17

18

19

20

21

22

23  _____
         ADELE C. FRAZIER, CSR 9690, CRR, RMR
24         FEDERAL OFFICIAL COURT REPORTER
                3470 TWELFTH STREET
25          RIVERSIDE, CALIFORNIA 92501
             ADELEFRAZIERCSR@GMAIL.COM

**UNITED STATES DISTRICT COURT**

1                        **APPEARANCES OF COUNSEL:**

2

3     **FOR THE PLAINTIFF:**

4            STEPHANIE YONEKURA
             United States Attorney
5            BY:  JOSEPH WIDMAN
             Assistant United States Attorney
6            3403 Tenth Street, Suite 200
             Riverside, California 92501
7

8     **FOR THE DEFENDANT:**

9
             MARKS & BROOKLIER
10           BY:  ANTHONY P. BROOKLIER
             10100 Santa Monica Boulevard, Suite 300
11           Los Angeles, California 90067
                      and
12           LAW OFFICES OF RAJAN R. MALINE
             BY:  RAJAN R. MALINE
13           3750 University Avenue, Suite 680
             Riverside, California 92501

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

```
 1              RIVERSIDE, CALIFORNIA; MONDAY, NOVEMBER 10, 2014

 2                             2:00 P.M.

 3              THE COURTROOM DEPUTY:  Calling item number 6, case

 4     number EDCR 13-73-JGB, United States of America vs. Theron

 5     Charles Barron.  Counsel, please state your appearances.

 6              MR. BROOKLIER:  Good afternoon.  Anthony Brooklier

 7     and Raj Maline for Mr. Barron, who is present.

 8              THE COURT:  Good afternoon.

 9              MR. WIDMAN:  Good afternoon.  Joseph Widman for the

10     United States.

11              THE COURT:  Good afternoon, Mr. Widman.

12              The matter is on for yet another sentencing

13     hearing.  Is -- are the parties ready to proceed to

14     sentencing at this time?

15              MR. WIDMAN:  Yes, your Honor.

16              MR. BROOKLIER:  Yes, your Honor.

17              THE COURT:  Very well.  Then you want to be heard,

18     Mr. Brooklier?

19              MR. BROOKLIER:  Yes, your Honor.  Thank you very

20     much.

21              Your Honor, it's our respectful suggestion and hope

22     that the Court sees fit to give this young -- this

23     21-year-old young man, who was 19 at the time of his arrest,

24     probation.  He's a young man who has never been in trouble

25     with the law before.  And in our brief to the Court there's a
```

**UNITED STATES DISTRICT COURT**

1    section where we -- we attempted to do an exhaustive survey

2    of the federal cases where probation was, in fact, granted.

3    It's at page 32 of our sentencing position.  It's entitled,

4    *Nonexhaustive List of Child Pornography Cases in Which*

5    *Defendant Received Sentence of Probation or One Day*.

6           And there seems to be certain themes that those

7    cases talk about.  And I respectfully submit that when you

8    look at the cases and read the cases and what they stand for,

9    that Mr. Barron fits virtually every -- every criteria where

10   a court saw fit to grant probation.  There are cases that

11   indicate when -- as a young man --

12          THE COURT:  I understand your argument,

13   Mr. Brooklier, but the problem with that argument is that

14   there might be hundreds of other cases which fit the same

15   criteria in which the defendant did not get probation.  So I

16   don't know how powerful that argument is.  You show me a

17   sample of the cases in which certain factors led certain

18   courts to give probation, but you're not showing me the

19   entirety of the courts that sentence people with similar

20   factors and whether or not all of them or some of them or

21   just a small part of them impose a sentence of probation.

22          MR. BROOKLIER:  Well, obviously, your Honor, we're

23   representing the defendant, and we want to point out to the

24   Court.

25          THE COURT:  I understand that.  But I think the

**UNITED STATES DISTRICT COURT**

1    argument, I think, although valid, it loses a little bit of

2    steam because it is a selective representative sample of a

3    larger sample, and I don't know what the other half of the

4    equation is.  I don't know if this represents 1 percent of

5    the courts that had similar factors that impose probation or

6    represents 90 percent of the courts that had similar factors

7    and impose probation.

8              MR. BROOKLIER:  Well, I respectfully suggest that I

9    think it's up to the prosecutor to -- I think it's -- for us

10   to adequately represent our client to indicate to the Court

11   the cases where, in fact, certain criteria were met where the

12   court saw fit.

13             I think what's unusual here, your Honor, is he fits

14   every criteria of almost virtually every criteria where the

15   courts have found fit to give probation, no time, or one day,

16   in custody.  He was molested as a child.  We've cited those

17   cases.

18             His use of child porn started at the age of 14.

19   There's a case right on point that we cited.

20             He's never been arrested before.  That's another

21   criteria that the court case pointed to.

22             He's not a threat to the community.

23             He's never acted out.

24             He maintains strong employment.

25             He has a strong family.

**UNITED STATES DISTRICT COURT**

1          He is very -- we have Dr. Whiting's report.  He

2     percentiles out at 13 percent in terms of intellectual

3     ability.  He's in the 13th percentile.

4          He's very, very compliant.  You know, he has been

5     going to Sharper Future every Monday for, I think, over a

6     year.  And you should have a report and some kind of

7     assessment from them.  That's a treatment that he does

8     through pretrial.

9          He's very -- he's immature, your Honor.  He lacks

10    judgment, particularly during his teenage years.

11         He's timid.

12         These things I'm giving you are the cases -- are

13    the criteria that the courts relied on to give the sentence

14    that we're asking for.

15         He's going to be -- he's going to be targeted in

16    prison.  He's vulnerable.  It's like sending a child -- it

17    would be like sending a child to a federal prison.

18         Dr. Whiting indicates, as these cases indicate,

19    that there's little risk of reoffending.

20         He's socially dysfunctional.

21         As I mentioned, he's never acted out.

22         And he's amenable to treatment.

23         Everything that I've indicated to you is what this

24    young man is.  And everything I've indicated to you are

25    criteria that the courts have used, yes, to justify a

**UNITED STATES DISTRICT COURT**

1    sentence of probation.

2          And then over and -- over and above that, you have

3    this curious situation -- and this was -- the things I am

4    going to point out to you now are a summary of what Sheryl

5    Katz, our expert, testified to.  There is quit a bit of use

6    of others on the computer.  There are two others that used

7    GigaTribe to download pornography.  There were four user

8    accounts by GigaTribe.  I don't think this is challenged by

9    the Government.

10          There is a resource folder containing images of

11   preteen girls at a rapidfiles site.  That is not Mr. Barron.

12   There are chats between that rapidfiles account and other

13   users who are not his -- not timothy.barr11.  In fact, in one

14   chat rapidfiles tells a person to "Add my friend Timothy" to

15   the disbursement.  There's an iPhone backup on the computer

16   with a device named "Cooper."

17          In any event, your Honor, Sheryl Katz indicated to

18   the Court that this was very elementary.  The computer use

19   here, the way it was set up, was very, very elementary, as if

20   it was set up by kids.  And that's what happened here.  It

21   happened when he was 14 years old.

22          And I -- I don't think that he started this.  I

23   don't think he initiated this.  He's a follower.  He's very

24   compliant.  He was very compliant with the agents.

25          And Dr. Whiting's report gives us a lot of insight

**UNITED STATES DISTRICT COURT**

```
 1    into this young man.  He -- Dr. Whiting indicates that even

 2    when he was a child and he had all these educational problems

 3    and everything, he wasn't a problem.  And Dr. Whiting points

 4    out that a lot of times when children are going through that,

 5    they act out because they're frustrated.

 6            This is a nice young man.  And I think that -- I

 7    think that that bodes well for the Court to give him

 8    probation because he is so compliant.  He so much wants to

 9    please.  You know that his mother and grandmother have been

10    here for every court appearance.  He lives with them.

11            He -- we're asking the Court to give him home

12    detention for this period of time.  You're not going to have

13    a problem with him, your Honor.  Dr. Whiting indicates that

14    he -- he's got a job.  In fact, he -- he works at the airport

15    in Ontario.  He cleans planes.  He unloads planes.  In fact,

16    he'll tell you when he speaks to you, I believe, that he got

17    an employee of the month award.

18            He has a real finite, small world, your Honor, and

19    he doesn't need to go to prison.  It would be a tragedy, I

20    think, to send this young man to prison.  He's small.  He

21    looks young.  His speech pattern is that of almost a child.

22    He's child-like.  And I don't think that there's any place

23    you can send him -- I've checked out Tucson.  I've checked

24    out the Bureau of Prisons, what they're going to do.  When I

25    asked them and called them, what they tell us is, well,
```

**UNITED STATES DISTRICT COURT**

1     contact us after he's sentenced if he, in fact, goes to jail.

2     So we're not making much headway.

3          I know the Court expressed some interest in us

4     checking out one of the facilities in Tucson, which I want

5     the Court to know that we did.

6          You know, he told the agents when he was

7     interviewed that his computer abilities out of 1 to a 10 were

8     9.  And Dr. Whiting says he overestimates his skills on a

9     regular basis.  "He's 9 on a scale of 10 in his computer

10    skills."  His mother said 3 or 4.  He couldn't complete his

11    college registration because he couldn't figure it out.  He

12    has an unrealistic view of himself, et cetera.

13         He wants to be a pilot in the Air Force while being

14    a long time special needs student and requiring significant

15    correction for his vision.

16         He lacks social skills.  This is -- I really think

17    this is a young man, your Honor, that the system can give a

18    chance to, and I don't think you're ever going to see him

19    again.  If you granted him probation, if you did that for

20    five years, you would have that hanging over his head.  And

21    if I'm wrong, you could do whatever you think is necessary at

22    the time.

23         It would just be heartbreaking, I think, to send

24    this young man to prison given that I don't think he was the

25    genesis of this.  I don't think he had the skills to do this.

**UNITED STATES DISTRICT COURT**

```
 1    And we know that there were other people involved.  We know
 2    that -- in fact, there was a young man who was named in
 3    Dr. Whiting's report who probably started this whole thing.
 4    But for him, I don't think we would be here today.  And
 5    without going through it, I think the probation officer
 6    recognized and articulated many of the same conclusions that
 7    Dr. Whiting came to.
 8              I'd like to try and answer any questions if the
 9    Court has any.
10              Mr. Maline --
11              THE COURT:  One question that I had is --
12              MR. BROOKLIER:  Yes, your Honor.
13              THE COURT:  -- with respect to restitution, what is
14    your position with respect to the requested restitution?
15              MR. BROOKLIER:  Mr. Maline was going to talk about
16    that, your Honor, if you don't mind.
17              THE COURT:  Well, let me hear from the Government.
18    I have some questions from the Government about
19    restitution.
20              MR. WIDMAN:  Thank you, your Honor.  I'd like to
21    just -- I'm going to be brief, but I would like to provide a
22    little road map.  First I'd like to -- I'd like to just to
23    the best of my ability, based on my notes and my memory,
24    remind the Court about the previous sentencing hearing we had
25    in this case.  And I would like to go through the parties'
```

**UNITED STATES DISTRICT COURT**

1     different recommendations and what the guidelines are.  Then

2     I'd like to briefly summarize some of the arguments we made

3     in the sentencing paper.  And, finally, respond to the

4     statements defense counsel has made today.

5               THE COURT:  Very well.

6               MR. WIDMAN:  As the Court may recall, on March 24th

7     we had pretty much an entire sentencing hearing on this case.

8     Now, some information has come out since then and that has to

9     be accounted for, of course, but at that time the Court's --

10    one of the Court's concerns or questions was about whether or

11    not the defendant's conduct with child pornography was

12    volitional or passive.

13              And as the Court knows some months ago we responded

14    and provided what we consider a fairly detailed explanation

15    of his statement to the authorities at the search warrant,

16    how GigaTribe works, and how -- basically, the idea it was

17    passively downloading for years and years is not consistent

18    with the way that GigaTribe works.  So there, certainly, was

19    at least some volitional element for some lengthy period of

20    time based upon those sources of evidence.

21              The guidelines in this case -- and as everyone

22    knows, the guidelines --

23              THE COURT:  Well, how do you deal with the expert's

24    conclusions that there were other potential users of that

25    same computer, and there's different accounts, and some of

**UNITED STATES DISTRICT COURT**

1   the active activity could be ascribed to those other users?

2   How confident are you, really, that Mr. Barron is solely

3   responsible for everything that's in that computer?  How

4   confident are you?

5          MR. WIDMAN:  We can't be confident that he's

6   responsible for every single image.  It appears, as the Court

7   heard from the witness -- and there was no time frame

8   provided for most of that evidence that other people had

9   charged their -- or backed up their iPhone on there or had

10  accessed Facebook on there.

11         THE COURT:  But you would agree that there's at

12  least a question raised based upon her report and testimony

13  that there might potentially be other users of that same

14  computer which would be responsible for some of the activity

15  on that computer?

16         MR. WIDMAN:  It's certainly possible.  And the

17  defendant has consistently identified that there was some

18  person some years earlier.  I would just try to focus the

19  Court on the time frame.  This other person, according to the

20  defendant, and uncontradicted by any other evidence, was

21  involved years earlier, like three years, approximately, from

22  my recollection of the papers, which I have re-read just

23  moments ago.

24         So someone else, apparently, did show him GigaTribe

25  and get him set up on GigaTribe.  But from there the evidence

**UNITED STATES DISTRICT COURT**

1    shows he volitionally continued.  He got interested in it.

2    He was part of it.  It was a habit he was doing.  He was

3    going on GigaTribe downloading, making available to others,

4    his collection, which the charged instance of distribution in

5    the indictment that was timothy.barr11, that was undisputedly

6    him.

7           So what it appears is that an older person, older

8    friend, sort of showed him GigaTribe, perhaps downloaded it

9    on to his computer, and then, you know, he, kind of, took the

10   ball and ran with it for some years after that.  That looks

11   like what happened in this case.

12          THE COURT:  Very well.  You can continue.

13          MR. WIDMAN:  So the guidelines in this case are 120

14   months.  Now, I think we all recognize the guidelines in

15   child pornography cases are very harsh.  They're very

16   significant.  Probation has recommended 30 months.  The

17   Government is recommending 63 months.  That is a six level

18   downward *Booker* variance.

19          You know, I maybe messed up my road map a little

20   bit, but the defense started the argument about -- their

21   argument today, basically, by pointing out what other

22   district judges have done, and then, sort of, making an

23   argument that this district court should do the same thing.

24   There is a method for arriving at sentences, of course, and

25   I'm not going to be, sort of, overly sarcastic or pedantic

**UNITED STATES DISTRICT COURT**

```
 1    about it, but it's 3553(a).  Those lay out the factors.

 2    Every court that gets these cases is supposed to go through

 3    those factors and analyze it in light of that and make its

 4    own determination of the appropriate sentence under those

 5    factors.

 6             As the Court points out, the Government has -- and

 7    as defense pointed out, we have not gone back and provided a

 8    master spreadsheet of every court, of every case.  That's

 9    impractical.

10             What's supposed to happen is we argue the 3553

11    factors.  And one of the factors, the starting point, is the

12    guidelines, which we think is too high in this case, and,

13    certainly, the defense does, and the probation office does.

14    The question is how much lower do we go?

15             So with that in mind, one of the factors is the

16    seriousness of the offense, the nature of the offense.  It's

17    not all about whether the defendant is going to reoffend.

18    There is some part of it is just how bad is what he did.  How

19    does that impact the community?  And what is an appropriate

20    sentence in light of that?

21             Child pornography is an unusual kind of offense

22    because many times you have people, like the defendant, who

23    present many significant mitigating circumstances, but the

24    offense itself is one of the most heinous things, not because

25    he molested a child -- there's no evidence that he ever
```

1    did -- but because by participating in this marketplace,

2    you -- people are affirmatively driving an industry which

3    feeds on the most unspeakable and horrible things that the

4    depths of the human condition people can do to children.

5         And all of those people who collect this and, you

6    know, use it in their own way, those people are not

7    blameless.  Those people are responsible.  Because if those

8    people were not there, if there was no marketplace, if there

9    was no demand, the suffering of these children would never

10   take place.

11        And, certainly, children are going to get molested

12   whether or not they're videotaped, but the videotaping of it

13   and the distribution of it, and the consumption of it by

14   people like the defendant, it makes it worse.  It makes what

15   was a horrible tragedy from someone's childhood, being

16   molested, and makes it a life-long tragedy.  And there are

17   children who deal with this.  And now they're adults, many of

18   them, and their lives -- you never want to say someone's life

19   is ruined, but their lives are really, really irreparably

20   damaged.

21        And those people like the defendant who participate

22   in this marketplace, who drive this marketplace, who collect

23   thousands and thousands of images of these children being --

24   not just displaying their genitals, but being, essentially,

25   tortured in the way that's described in our papers, they

1    should not be held blameless.

2          Part of it is the seriousness of the offense, and

3    that's a significant part of why the Government thinks that

4    the sentence that it's recommending is appropriate and that a

5    sentence of probation is not.

6          MR. BROOKLIER:  Your Honor.

7          THE COURT:  I don't think he's done.

8          MR. BROOKLIER:  Oh, I'm sorry.  Pregnant pause.

9          MR. WIDMAN:  The history and characteristics, a lot

10   of that stuff has, sort of, been worked over pretty heavily

11   in this case.  We do think that his history and

12   characteristics present a mitigating circumstance, but I

13   would like to address some of the comments.

14         The defense attorney said that he was molested as a

15   child; that, we would submit, is an overstatement.  In the

16   first sentencing paper we filed -- we filed a one-page under

17   seal on the side because it concerned that topic.  And,

18   although I don't have that piece of paper with me, I seem to

19   recall that it was something along the lines of when he was,

20   like, a young teenager, he was at an older boy's house

21   sleeping over and twice -- I believe two or three times he

22   performed oral sex on the older boy, who was also not 18, who

23   was a minor.

24         So I believe that is -- that, or something close to

25   it, is what the sexual molestation as a child allegation

1   comes from.  So I wanted to make sure that those facts are

2   described in a, sort of, factually objective manner.

3          Yeah, the defendant -- we don't dispute that in

4   many ways he is a nice young man, but, ultimately, people who

5   do things like this, you have to factor in what they did in

6   this case in assessing whether they're a nice young man or

7   not.  We have no doubt that the defendant presents many

8   positive qualities, and that he wants to do right going

9   forward.  And I'm sure that he regrets that he ever was

10  involved in this conduct.

11         And the Government also recognizes and appreciates

12  the support the defendant has from his family.  And, you

13  know, we really do wish him in the best and hope that he's

14  able to avoid engaging in this conduct in the future.  But he

15  has done what he has done, and he should be held responsible

16  for the harm that his participation in this marketplace has

17  caused.

18         So with respect to the histories and

19  characteristics -- I think I've already addressed the others

20  on the computer issue.  It's a little murky and muddled.

21  There does appear to be some support for the position he has,

22  but it sounds like the idea that he is not responsible for

23  any of it is -- he's admitted as such -- is not accurate.

24  And it appears for some lengthy period of time before he was

25  caught, he was involved in this.  Actually, he admitted to

**UNITED STATES DISTRICT COURT**

1    the agents that the night before the agents showed up he had

2    initiated downloading of content, child pornography, from

3    GigaTribe.

4              So one thing, your Honor, that we would submit is

5    largely a red herring is his alleged -- or we don't even

6    necessarily dispute it -- that he wasn't that great at

7    computers.  You know, no one's accusing him of being a

8    computer mastermind here.  Originally it was relevant because

9    whether or not he was maybe capable of using GigaTribe.  Now

10   I think it's been advanced as showing that he's not -- he's a

11   naive person.  All that aside, it's neither here nor there,

12   we would submit

13             THE COURT:  I think the way that I see that is if

14   he's saying that he's a 9 out of 10 on the -- as a computer

15   expert, and if he wants to be an Air Force pilot, and he,

16   obviously, may have a tendency to puff up or exaggerate

17   either his competence or his involvement.  So that to me may

18   call into question the statements he made to law enforcement

19   regarding the extent of his involvement.  I think to that

20   extent they're relevant.

21             I mean, if he has a propensity to say or believe

22   that he did or is more than he actually did or is, maybe that

23   translated to what he said to law enforcement officers.

24   But -- so I get your point, that it doesn't really -- it

25   doesn't matter whether you are a 9 or a 4, if you have a

1  computer and you download child pornography, then you're

2  committing the same crime regardless of expertise.   I

3  understand that point.

4       But I think it might be relevant generally to

5  history and characteristics and whether or not we can really

6  trust that the involvement that he related to law enforcement

7  officers is really truly his involvement.  That's the way I

8  see it.

9       MR. WIDMAN:  And I appreciate that.  That's pretty

10  much the Government's position, so on that I'm going to

11  submit.

12       THE COURT:  Before we turn to Mr. Brooklier, I've

13  given you some your opportunity -- I have some questions

14  regarding your restitution argument, Mr. Widman, especially

15  with respect to your second supplemental brief regarding the

16  restitution request by the victim Andy.  The way I read your

17  second supplemental request is you request -- there's a total

18  amount of damages which the victim Andy claims to have

19  suffered and that's -- let me just get the figure --

20  $2,121,963.  That is correct, right?

21       MR. WIDMAN:  Yes, your Honor.

22       THE COURT:  Then to arrive at your figure of

23  $235,773 -- actually, it should be 66 cents -- you divided

24  the 2 million dollar figure by 9, correct?

25       MR. WIDMAN:  Yes, your Honor.

```
1              THE COURT:  But the email that the requester sent,
2    you said that there have been denied previous restitution
3    awards, right?
4              MR. WIDMAN:  Apparently so.  If the Court saw
5    that --
6              THE COURT:  So this would be the tenth.
7              MR. WIDMAN:  Or perhaps I got the arithmetic wrong.
8    I apologize.
9              THE COURT:  At the very least it should be divided
10   by 10, not 9.
11             MR. WIDMAN:  We're counting the defendant in that.
12   I guess that's fair.  I think it should be 10.
13             THE COURT:  And then the other, kind of, more
14   broader point I have with that is that -- I mean, if I impose
15   1/10 or whatever damages the victim has supposedly suffered,
16   and then there's 100 people more convicted of that offense,
17   isn't that tenth person suffering by the fact that they're
18   tenth and not 100?
19             MR. WIDMAN:  That's a good point.  Rhetorically,
20   yes, based on a certain degree of luck, I suppose.
21             THE COURT:  So how is that -- because as to the
22   other victims, obviously, there were more people that have
23   been convicted of the offense, so the restitution amount is
24   lower.  Even though the total damage is approximately the
25   same -- it was over one million for one of the victims -- but
```

**UNITED STATES DISTRICT COURT**

1    there were 100 or 53 other people that had been convicted of

2    that crime or a crime related to that victim.  So the

3    restitution request as to those victims is much lower, in the

4    1,000- to $7,000 range because of that accident that's out of

5    the control of the particular defendant.

6            MR. WIDMAN:  I mean, I understand that, your Honor.

7    I guess the one response I would make is that frequently how

8    much restitution someone has to pay -- I mean, there is such

9    a thing as bad luck, basically.  What do they say in tort

10   law?  The plaintiff who has a very soft exterior and kind of

11   falls down?  Egg shell plaintiff.  I mean, there sometimes is

12   just bad luck.  If you engage in this conduct --

13           THE COURT:  There could be -- I agree there could

14   be bad luck.  Because you could be jointly and severally

15   liable, and you would be the one that has the funds and the

16   other one doesn't, and you get stuck paying all of it.  It's

17   not often the case in the law that there are future potential

18   responsible parties which the case doesn't know anything

19   about.  I mean, usually when there's a case with jointly and

20   several liability, you know more or less the extent of people

21   who are potentially jointly and severally liable for the

22   damage that has been caused.  But not here because you don't

23   know, and you can't really anticipate, the number of people

24   that will be convicted for an offense related to a particular

25   victim in the future

**UNITED STATES DISTRICT COURT**

1          So -- and I understand that every time that these

2     images are viewed, there's a repeat of the same offense.  I

3     understand that there's additional damage caused by each

4     repeated viewing.  It seems to be sort of arbitrary to be

5     either the tenth person in line or the hundredth person in

6     line and that determine the extent of the restitution

7     obligations.  It seems to be somewhat arbitrary.

8          How do you respond?

9          MR. WIDMAN:  First of all, as a matter of fairness,

10    in terms of could the Court sleep at night or the parties

11    sleep at night or the Government sleep at night?  I think by

12    all rights every person who does this could fairly be

13    asked -- ethically be asked to reimburse their victims for

14    their losses just like in a civil case.  So anything less

15    than that, I don't think there's anything unethical about

16    it.

17         Now, whether or not as a matter of the law on

18    damages it's a good -- it's a good policy, it's a good

19    practice, I would just want to remind the Court about the

20    previous -- my comment about it doesn't seem like there's any

21    perfect solution.  The old way was we used to come in and ask

22    the Court for apportioned restitution.  We'd say 5,000,

23    10,000.  But that's not appropriate because it's not bound in

24    any sort of actual conceptual way to anything.  It's really

25    just arbitrary.

1      So my office is using this formula as trying to

2  create some logical link.  At this point this is the best

3  thing that we can think of under prevailing Ninth Circuit

4  law.

5      THE COURT:  Very well.  I think there's a lot of

6  problems with it.  I think it's just -- it's an accident

7  whether you're tenth or 100th and the 100th is 100th for the

8  total damages and the 10th one is one-tenth.  It just doesn't

9  make a lot of sense to me.

10      The other question that I had is a part of the

11  damages in the exhibits that you submitted in your second

12  supplemental position paper regarding restitution, part of

13  the costs, I guess, incurred, there was a mention of a report

14  by -- Dr. Corbin was it?

15      MR. WIDMAN:  I'm not sure, your Honor.

16      THE COURT:  And my question was whether that report

17  was particularly prepared and submitted -- it's a $29,000

18  report -- for this case or whether it had also been used in

19  other cases.

20      MR. WIDMAN:  I'm fairly certain it was used in

21  other cases.

22      THE COURT:  Why would this particular defendant be

23  liable for the entire amount?

24      MR. WIDMAN:  Is the 9,000 the Court is referring

25  to -- that's not part of the attorney's fees and so forth

**UNITED STATES DISTRICT COURT**

```
 1    portion?

 2              THE COURT:  No.  It was $29,000 for a forensic

 3    psychological exam and a March 13th, 2014, follow-up report

 4    with Dr. David Corbin.

 5              MR. WIDMAN:  I think that those reports are

 6    submitted in every one of these cases that this victim is

 7    implicated in.

 8              THE COURT:  Right.  So I understand that.  But then

 9    if it's the same report or the same base report -- perhaps a

10    different update.  If it's the same report, because the

11    report costs $29,000, I think it just doesn't make sense if

12    it's the same report that every time the person would be

13    liable for the full amount of that report as opposed to 1/10

14    of that cost of that report.

15              MR. WIDMAN:  I see what you mean, your Honor.  That

16    does seem -- I understand the Court's concern in that regard.

17              THE COURT:  It wasn't very clear to me whether or

18    not this report -- I assume that it was used with respect to

19    other requests because it's a very comprehensive report.  I

20    can't imagine doing the same report every time.

21              MR. WIDMAN:  They send the same packet to the

22    prosecutors every time.

23              THE COURT:  Those are the two certain questions I

24    had.  I'll let counsel argue the restitution amount.

25              MR. MALINE:  Your Honor, the Court, basically,
```

**UNITED STATES DISTRICT COURT**

```
1    summarized all the questions that we had about restitution.

2    I don't have anything further to say on restitution other

3    than we leave it in the Court's good hands to fashion out the

4    appropriate restitution in this matter.

5            I do have one comment, and it goes along the lines

6    of the expert's report, and that is the attorney's fees of

7    $33,415, which in the Government's second request for

8    restitution indicates that that $33,415 for attorney's fees

9    is for filing the restitution request.  I'm not sure --

10   again, is that just for this request that they prepared or is

11   that a general request that they send out to -- in all the

12   cases?

13           MR. WIDMAN:  I'm pretty sure it's the latter.  It's

14   for all the cases.

15           MR. MALINE:  So that's a similar request, then,

16   that the Court look at that as well.

17           And I did want to touch on one aspect of the

18   Government's position of Mr. Barron's use of the computer and

19   downloading of these images.  I think it's -- Mr. Barron's

20   use of the computer and downloading of these images, I

21   believe has been mischaracterized, which is -- which is why

22   we had a pause at the last sentencing hearing where we had to

23   re-examine the position that we originally had, and that's

24   because Ms. Katz had indicated that as far as Mr. Barron's

25   involvement in downloading images, his involvement, according
```

**UNITED STATES DISTRICT COURT**

```
 1    to the forensic data that the Government provided, occurred

 2    on, basically, one occasion, and that was through the use of

 3    GigaTribe through this user name called timothy.barr.

 4           And in that user event images were -- began to

 5    download through GigaTribe through another party who had

 6    their folder open to timothy.barr11.  And that download

 7    started a month prior to the agents arriving at Mr. Barron's

 8    home, which meant that once that was started by Mr. Barron,

 9    it kept coming and coming and coming.  They had no way to

10    stop it.  Mr. Barron's mother tried to stop it.  They tried

11    to turn the computer off.  They tried to delete it.  They

12    tried to do everything.  They couldn't do it.  It just kept

13    coming and coming and coming.

14           And that's the way GigaTribe works.  If you tap

15    into somebody's folder that has a huge amount of data that's

16    going to be disseminated, you're going to get all of it

17    unless you know how to do this.  Unless you know how to set

18    the appropriate filters, set the appropriate computer

19    mechanisms that will stop that and only capture images that

20    you did searches for, then you would be able to curtail that

21    downloading.

22           But, of course, that goes again to his

23    unsophistication.  Once he tapped into that other person's

24    folder, it kept coming and coming and coming, and it didn't

25    stop.  And that's really the conduct that Mr. Barron was
```

**UNITED STATES DISTRICT COURT**

1    involved in.

2            There was nothing about -- there was no forensic

3    data that indicated Mr. Barron was involved in this activity

4    before that time.  The fact that he made a statement to

5    agents that he began viewing the pornography at age 14, it

6    was not child pornography.  It was pornography, not child

7    pornography.

8            THE COURT:  What evidence do you have that as to

9    the amount of times he viewed either those images which he

10   caused to be downloaded on to his computer or previous images

11   that had been downloaded, perhaps, by others under your

12   theory?

13           MR. MALINE:  Well, he -- that's very possible that

14   he viewed images that were downloaded through other parties

15   through different accounts.

16           THE COURT:  You don't have any way of knowing

17   whether that was limited or expansive, right?

18           MR. MALINE:  That's correct.  We would not know.

19   But according to Ms. Katz and the Government's data, most of

20   those images that were on the computer were through this

21   massive download that was occurring a month prior to the

22   agents arriving at Mr. Barron's home.

23           If you can imagine a 24-hour continuous download of

24   images that went on for a month, you can imagine how many

25   images were eventually dumped on to Mr. Barron's computer.

1    And he had no ability to curtail that because he didn't know

2    how to set the parameters of what gets downloaded.  That's

3    part of his unsophistication.

4            In addition to that, your Honor, if you look at

5    Ms. Katz's report and if you -- and I'm sure the Court heard

6    her testimony -- the search terms that generally are

7    associated with GigaTribe and people who are searching child

8    pornography, the terms of *Lolita*, and things of that nature

9    were nonexistent when it came to Mr. Barron's user name.  And

10   that's part of the reason I believe he started getting all of

11   this data, because he wasn't able to limit his ability to

12   retrieve data.

13           But in any case, I believe that the Government's

14   position as to his use and downloading of materials, child

15   pornography materials, have been at least overexaggerated or

16   misunderstood.  And I would submit on that.

17           THE COURT:  Very well.

18           MR. WIDMAN:  Your Honor, can I just respond to a

19   couple things?

20           THE COURT:  Yes.

21           MR. WIDMAN:  First of all, this -- what defense

22   counsel is saying about this is all one giant download from a

23   month ago, I don't believe that's covered at all in

24   Ms. Katz's report.  It's true that you can do these giant

25   downloads, *I want everything that guy has*, and do one huge

**UNITED STATES DISTRICT COURT**

```
 1    download on GigaTribe.  But the idea that most of the CP
 2    collection on the computer was from this one gigantic
 3    download a month before, I don't believe that's supported in
 4    any evidence before the Court.
 5                THE COURT:  What is your support for that
 6    assertion?
 7                MR. MALINE:  Your Honor, that is Ms. Katz review --
 8    Ms. Katz and Mr. Brian LeRock rock viewing of the -- because
 9    Mr. LeRoc, who also works with Elluma, had to go to the ICE
10    facility in Long Beach where he was able to, not take the
11    computers, but he was able to view the desktop files and he
12    was able to make a copy.  So he was able to view it there.
13    And it was their joint viewing of the -- of that data, plus
14    the Government's report in this matter, and that's where they
15    came up with that.
16                THE COURT:  Can you cite to a specific portion of
17    that report in which it says that?
18                MR. MALINE:  Well, in their report they didn't
19    cover -- they didn't cover that.  They covered the areas of
20    user sophistication.
21                THE COURT:  So you're just relating what they told
22    you, right?
23                MR. MALINE:  Correct.
24                MR. WIDMAN:  And we, obviously, have never had a
25    chance to cross-examine anyone about that or challenge
```

```
 1   that.

 2           THE COURT:  Right.

 3           MR. WIDMAN:  Also, this thing about to the extent

 4   that the defense is relying that he didn't use search terms,

 5   Ms. Katz was, sort of, noncommittal about it, but based upon

 6   my consultations with my own expert after looking at

 7   Ms. Katz's report and also it's based on Kelly Codis's

 8   declaration, I can say in good faith based upon those sources

 9   of information that I don't believe you do search for images

10   in GigaTribe, you search for other users.  And sometimes

11   people put in their user names, like, indications of what

12   their content is.  Like, they'll put in *PTHC, preteen*

13   *hard-core*, people who are interested in certain kinds of

14   things.  But it's not like on the internet where you can just

15   search for the subject matter of the sexual content that

16   you're looking for.

17           So I think Ms. Katz, respectfully, was, sort of --

18   she didn't realize that.  And I, sort of, asked her about

19   that, and she didn't, sort of, double down on it.  She said,

20   *I believe.  It's my understanding*.  So to the extent the

21   defense is relying on that, we would submit it really has no

22   relevance because that's not how GigaTribe works.

23           THE COURT:  Very well.  Anything further?

24           MR. MALINE:  Submit it, your Honor.

25           MR. WIDMAN:  No, your Honor.
```

**UNITED STATES DISTRICT COURT**

1          THE COURT:  Very well.  Mr. Barron, you have a

2     right to state anything you would like or say anything you

3     would like to me on your behalf before I impose sentence on

4     you.  So if you wish to say something, please do so at this

5     time.

6          THE DEFENDANT:  Um, first of all, I'd like to say

7     sorry about this whole event, period, as a whole.  Just the

8     fact that I do thank you a lot for continuing this for us to

9     try to get as much information as we can, even though some of

10    the stuff we weren't able to still, like, bring in as -- as,

11    like, evidence and stuff for us.  But I do thank you a lot,

12    and the Court for always continuing it for it could -- for we

13    can try to at least get more of our proof and more of our

14    side.

15          When -- when he was talking about if you guys don't

16    know if this is something I'm going to do again or something,

17    since this is something that I initiated from the start, it's

18    not something that I would try to even start up again.  So

19    that is me trying to promise you that -- I could only try to

20    promise and to, like, have you trust the fact that, you know

21    -- this isn't something I'm just going to all of a sudden

22    blow off and be, *Oh, okays.  This situation's done with.  Let

23    me go back and doing this*.  It's something -- that's not even

24    something that's even on my mind or anything, especially

25    since this wasn't even anything I initiated.

**UNITED STATES DISTRICT COURT**

 1          Throughout this whole time -- this has been almost
 2   about -- almost two years now.  From the first time that I
 3   got -- from the first time that the agents had came to the
 4   house it's been about two years now until the time I got
 5   arrested.  It's been a year and a few months now.  Within
 6   that whole time of all this going on I was able to still
 7   maintain work and school.
 8          Um, with work I -- I am able to -- I'm able to --
 9   you know, I was able to continue and still go to work every
10   night and stuff even after some of the things that I was
11   denied of from work because of this situation which stopped
12   me from getting in certain promotions, positions, as for
13   example, supervisor.  I was able to -- because of my work
14   ethics, I was able to be submitted as a supervisor.  But
15   because of this situation, it was denied because --
16          THE COURT:  So you're saying because you had this
17   case going on and your employer knew about it that you were
18   not considered for supervisor; is that what you're saying?
19          THE DEFENDANT:  It's because -- because management
20   knows about it.  My manager --
21          THE COURT:  Uh-huh.
22          THE DEFENDANT:  -- she knows about it.  But because
23   supervisor -- since I do work at an airport, at Ontario
24   international Airport, and we deal with international
25   flights, there's a thing that's called a Customs Seal that we

**UNITED STATES DISTRICT COURT**

```
 1    have to have on our badge.  And in order for you to be a

 2    supervisor, you have to have a custom because of the fact

 3    that you have to be able to -- be able to move around to

 4    every single flight, not just limited to domestic flights.

 5           And so because of that, when I did the paperwork

 6    for my customs seal, it was denied from LAX from the Homeland

 7    Security over there because of this situation that I'm going

 8    through right now.  My management doesn't -- my management

 9    doesn't know, like, if it's something that's, like,

10    permanent.  So to them, they're just constantly asking me to

11    refill out the paperwork.  But as of right now it's not

12    something that I have done yet because I don't want to get

13    denied again from it and go through the whole situation with

14    my management from them.

15           But past that, I was able to get a -- like -- like

16    an award of -- like, an award of, like, awareness, I guess,

17    where Delta Airlines from our airport -- the manager from

18    Delta Airlines nominated me as outstanding employee within my

19    whole company.  And so they had awarded that for me.  And he

20    was telling me that their whole corporate office is wanting

21    to do something for me, and also take me out to lunch.

22           So from also doing all that, it's still I -- I'm

23    still focusing on work and school, no matter how much I go

24    through when I come here and how much I'm going through when

25    I'm at home, having to still remember that I'm going through
```

**UNITED STATES DISTRICT COURT**

```
 1    all this stuff.  But with school I am able to continue still
 2    right now.
 3           I -- my main goal is becoming an airline pilot,
 4    which I'm hoping to become, which is why I'm in school right
 5    now.  And I'm in a transfer program at the school with the
 6    counselors so where they set me up for just classes to where
 7    I can transfer out to a college that would offer just that
 8    type of program.  I want to study for aviation so that I can
 9    try to go for being a pilot.
10           As far as this case, I have been under the
11    supervision of Officer Ms. Meredith Marole (phonetic) which
12    is my pretrial officer.  And I've been seeing her every
13    Thursday -- every second and fourth Thursday of every month
14    since the time of my arrest, which been a while, over a year.
15           And then also as a requirement for -- which was a
16    requirement for my bail at the time I had to go to Sharper
17    Future.  And I go to Sharper Future every Monday at 3:00 --
18    3:00.  But it, kind of, got pushed to 3:30 now every Monday
19    every week, every Monday right after school.  But because of
20    how my classes are on Mondays, we had to push it to 3:30 so
21    that I have enough time to drive from school to Sharper
22    Future.
23           We do sign in every time I go to Sharper Future.
24    And, I mean, it's a constant thing with my -- with the person
25    I see, the specialist I see from there, which is Dr. Meyers.
```

**UNITED STATES DISTRICT COURT**

1    And so that's my -- that's the person I see.

2           But I have to say, going through this situation,

3    even if it wasn't a situation that I initiated or anything, I

4    was able to within this period of time realize how to

5    appreciate the little things in life and how to take notice

6    of just how -- how much, you know, I wasn't really defending

7    myself as a person, how I would let people just overrun me,

8    and in a way not notice it.  And the times that I would

9    notice it, I would try to brush it off because of the fact

10   that I figured, you know, those are my friends or something,

11   or those are people who want to associate with me.  I didn't

12   ever want to open my eyes realizing that I was just someone

13   that was being used from these people.

14          And so from -- from that I was able to realize that

15   and just be able to appreciate more -- and sometimes it's

16   hard to try to explain that to people, especially if they

17   don't go through a situation like this or they're not in that

18   position of their life being in one or the other's hand and

19   not having, you know -- not having the choice of, oh, like,

20   am I going to still live my life and be free.  It's not in my

21   hands.

22          And so realizing that, it showed me just how much

23   to appreciate, you know, everything in life.  The fact that

24   my mom and my grandma always -- always been on my side

25   through this whole situation.  All the money that we put into

1    it just to prove, you know, the innocence out of this.  And

2    so I appreciate them so much because of the fact that I

3    know -- sometimes when you watch on TV or something like some

4    people don't have their family with them because of financial

5    or they don't want to deal with the situation.

6         But because of my grandma and my mom being the two

7    people that are always in my life every day, every second of

8    my life, they're able to be there and have my back on this

9    because of the fact that they know it's not something that I

10   initiated or started.  It's something that, I guess, I was

11   just, you know, left to deal with, like the rest of it, and

12   wondering how to get rid of this stuff before the whole

13   incident of when the agents came.

14        I -- I know also going through this situation I

15   learned how to always want to help others through things, not

16   just -- not just through, you know, one or the other type of

17   situation, but just to help people as in general just because

18   of the fact that I know how it feels to have people who are

19   willing to help you, especially if they're fighting for

20   something that's right.

21        So I do thank my lawyers, because they've been

22   working tough trying to get as much information as we can to

23   prove innocence.

24        I thank Ms. Marole for helping me through this type

25   of situation also, being able to see her twice a month and

**UNITED STATES DISTRICT COURT**

1     her just, kind of, like, you know, helping me stay on the

2     guidelines.  Because, once again, this isn't something that I

3     ever had to deal with.  So she's helping me, you know, stay,

4     you know, in on the guidelines of what I have to do and how

5     to get through this.

6            And also for Sharper Future because of the fact

7     that not only are they helping me in ways of dealing with

8     this situation, but they're -- they're listening and

9     they're -- and they're, like -- I guess in a way I can say

10    they help open my eyes.  They were part of the group and

11    circle that had helped open my eyes to realizing that no

12    matter what you're going through, the situation that, you

13    know, you know what was done, you know what happened, or, you

14    know -- you know, because you had to deal with it, but don't

15    let all that change who you are, which I'm not going to let

16    any of this change how much I want to help people.

17           I'm not going to let this change how much I want to

18    still push to going for being an airline pilot, to continue

19    working as much as I can at work and to continue to also, you

20    know, continue through school -- to also continue through

21    school.

22           And from -- through work I'm able to help my

23    grandma and my mom with financial stuff at home.  And so I

24    also help pay for -- I -- no, I also help with bills, like I

25    also contribute in bills, and also in food for the house.

**UNITED STATES DISTRICT COURT**

```
 1    And so that's what I do too.  And then I just -- I just -- I
 2    just help as much as I can as the ability that I can while
 3    going through this situation still.
 4              Yeah, I think that's it.
 5              THE COURT:  Okay.  Thank you very much.  Is there
 6    anything further?
 7              MR. BROOKLIER:  No, your Honor.
 8              MR. MALINE:  No, your Honor.
 9              MR. WIDMAN:  No, your Honor.
10              THE COURT:  Is there any reason why sentence should
11    not now being imposed?
12              MR. WIDMAN:  No, your Honor.
13              MR. MALINE:  No, your Honor.
14              THE COURT:  Very well.  Let me just go over the
15    calculation of the guidelines once again.  I believe I did so
16    before, but let me do that again.  The guideline calculation
17    is as follows:  There's a base offense level of 18.  The
18    specific offense characteristics total of 15 plus a
19    vulnerable victim enhancement for a total level of 35, minus
20    3 for acceptance of responsibility, is a total offense level
21    of 32.  Criminal history category 1.  The guideline sentence
22    is 120 months, because that's the statutory maximum
23    penalty.
24              As to restitution, the restitution order will be as
25    follows:
```

**UNITED STATES DISTRICT COURT**

1        As to the victim named Vicky, the restitution

2   amount is $2,613.83.

3        As to the victim Cindy, the restitution amount will

4   be $7,349.53.

5        As to victim Andy, the restitution amount will be

6   $8,700.  And that is composed of $2,900, which is 1/10 of the

7   fees for the report; and $3,300, which is 1/10 of the

8   attorney's fees; plus a $2,500 component for the actual

9   damage done to the victim himself

10        So the total amount of restitution for all three

11   victims will be $18,663.36.

12        Very well.  As has been written about and talked

13   about during this case, there are substantial mitigating

14   factors in this case:  We have the youth and apparent

15   unsophistication of the defendant in this case;

16        The fact that there are no previous contacts with

17   law enforcement;

18        The youth at the time of the offense.  I believe he

19   was 19 years old;

20        There's an extensive history of learning

21   disabilities, impaired intelligence, immaturity in this case;

22        And the added factor which was provided by the

23   defense expert regarding the question as to whether or not

24   the defendant was the sole user/operator of the computer at

25   issue in this case or whether there were other potential

**UNITED STATES DISTRICT COURT**

1    users.

2            There's at least a question in the Court's mind as

3    to whether or not there are other potential users and the

4    extent of their use.  There's no question, however, that it

5    was the defendant who had primary possession of the computer

6    and the images obtained on that computer.

7            So, therefore, the sentence is as follows:

8            It is ordered that the defendant shall pay to the

9    United States a special assessment of $100, which is due

10   immediately.  Any unpaid balance shall be due during the

11   period of imprisonment at a rate of not less than $25 per

12   quarter and pursuant to the Bureau of Prisons Inmate

13   Financial Responsibility Program;

14           Pursuant to Guideline Section 1.2(a) all fines are

15   waived as the Court finds that the defendant has established

16   that the defendant is unable to pay and is not likely to

17   become able to pay any fine.

18           Pursuant to the Sentencing Reform Act of 1984, it

19   is the judgment of the Court that the defendant Theron

20   Charles Barron is hereby committed on Count 3 of the

21   three-count indictment to the custody of the Bureau of

22   Prisons for a term of 12 months and one day.

23           Upon release from imprisonment the defendant shall

24   be placed on supervised release for a period of ten years

25   under the following terms and conditions:

**UNITED STATES DISTRICT COURT**

1          The defendant shall comply with the rules and

2    regulations of the United States Probation Office and general

3    order 05-02;

4          During the period of community supervision, the

5    defendant shall pay the special assessment in accordance with

6    this judgment's orders pertaining to such payment;

7          The defendant shall cooperate in the collection of

8    DNA sample from the defendant;

9          The defendant shall possess and use only those

10   computers and computer-related devices, screen user names,

11   passwords, email accounts and internet service providers,

12   which have been disclosed to the probation officer upon the

13   commencement of supervision.  Any changes or additions are to

14   be disclosed to the probation officer prior to their first

15   use.

16          Computers and computer-related devices include

17   personal computers, personal data assistants, internet

18   appliances, electronic games, cellular telephones, and

19   digital storage media as well as the peripheral equipment

20   that can access or can be modified to access the internet,

21   electronic bulletin boards, and other computers.

22          All computers, computer-related devices and their

23   peripheral equipment used by the defendant shall be subject

24   to search and seizure.  This should not apply to items used

25   at the employment site which are maintained by the employer;

**UNITED STATES DISTRICT COURT**

 1          The defendant shall comply with the computer

 2    monitoring program.  The defendant shall pay the cost of the

 3    computer monitoring program in an amount not to exceed $3,200

 4    connected to the internet;

 5          The defendant shall participate in a psychological

 6    counseling or psychological or sex offender treatment program

 7    as approved and directed by the probation officer.  The

 8    defendant shall abide by all rules requirements and additions

 9    to such program.  The probation officer shall disclose the

10    pre-sentence report or any previous mental health evaluation

11    reports to the treatment provider;

12          As directed by the probation officer the defendant

13    shall pay all or part of the cost of treating the defendant's

14    psychological, psychiatric disorders to the after care

15    contractor during the period of community supervision

16    pursuant to Title 18 United States Code Section 3672.

17          The defendant shall provide payment and proof of

18    payment as directed by the probation officer;

19          The defendant shall register as a sex offender and

20    keep the registration current in each jurisdiction where he

21    resides where he is an employee and where he is a student to

22    the extent that registration procedures have been established

23    in each jurisdiction.

24          When registering for the first time, the defendant

25    should also register in the jurisdiction in which the

**UNITED STATES DISTRICT COURT**

1  conviction occurred if different from the jurisdiction of

2  residence;

3          The defendant shall provide proof of registration

4  to the probation officer within three days of release from

5  imprisonment.

6          The defendant shall not view or possess any

7  materials including pictures, photographs, books, writings,

8  drawings, videos or video games depicting and/or describing

9  sexually explicit conduct as defined in Title 18 United

10  States Code Section 22562;

11          The defendant shall not view or possess any

12  materials including pictures, photographs, books, writings,

13  drawings, videos or video games depicting or describing child

14  pornography as defined in Title 18 United States Code Section

15  22568.

16          This condition does not prohibit the defendant from

17  possessing materials solely because they are necessary to or

18  used for a collateral attack, nor does it prohibit him from

19  possessing materials prepared and used for the purposes of

20  court-ordered mandated sex offender treatment when the

21  defendant's treatment provider or the probation officer has

22  approved of his possession of the materials in advance;

23          The defendant shall not own or possess, use or have

24  access to the services of any commercial or mail receiving

25  agency, nor shall he open or maintain a post office box

**UNITED STATES DISTRICT COURT**

1    without the prior written approval of the probation officer;

2         The defendant shall not frequent or loiter within

3    100 feet of school yards, parks, public swimming pools,

4    playgrounds, youth centers, video arcade facilities, or other

5    places primarily used by persons under the age of 18 unless

6    the defendant has written permission from the probation

7    officer;

8         The defendant shall not associate or have verbal,

9    written, telephonic or electronic communications with any

10   person under the age of 18 except in the presence of the

11   parent or the legal guardian of said minor, and, (b), on the

12   condition that the defendant shall notify said parent or

13   legal guardian of his conviction in the instant offense.

14        This provision does not encompass persons under the

15   age of 18 such as waiters, cashiers, ticket vendors, et

16   cetera, with whom the defendant must deal with in order to

17   obtain ordinary commercial services;

18        The defendant shall not affiliate with, own,

19   control, volunteer, or be employed in any capacity by a

20   business and/or organization that causes him to regularly

21   contact persons under the age of 18;

22        The defendant should not affiliate with, own,

23   control, and/or be employed in any capacity by a business

24   whose principal product is the production and/or selling of

25   materials depicting and/or describing sexually explicit

1    conduct as defined by Title 18 United States Code Section

2    22562;

3            The defendant's employment shall be approved by the

4    probation officer, and any change of employment must be

5    pre-approved by the probation officer.  The defendant shall

6    submit the name and address of the proposed employer to the

7    probation officer at least ten days prior to any such

8    scheduled change;

9            The defendant shall submit his person or any

10   property, house, residence, vehicle, papers, computer, or

11   other electronic communication or data storage devices or

12   media and his effects to search at any time with or without

13   warrant by any law enforcement or probation officer with

14   reasonable suspicion concerning a violation hae supervised

15   release or unlawful conduct by the defendant and by any

16   probation officer in the lawful discharge of the officer's

17   supervision function.

18           The drug testing condition mandated by statute is

19   suspended on the Court's determination that the defendant

20   poses a low risk of future substance abuse.

21           You want to self-surrender date, Mr. Brooklier?

22           MR. BROOKLIER:  A surrender date?

23           THE COURT:  Yes.

24           MR. BROOKLIER:  Pleases.  Thank you.

25           MR. BROOKLIER:  May we have -- his semester

```
 1    finishes, I think, in mid-December.
 2              THE COURT:  After the holidays is fine.
 3              MR. BROOKLIER:  Would sometime in January be okay,
 4    towards the end of January?
 5              THE COURT:  Yes.
 6              MR. BROOKLIER:  Thank you very much.
 7              THE COURT:  Just give me a date.
 8              MR. BROOKLIER:  I'm sorry, your Honor, I don't have
 9    my calendar in front of me.
10              MR. MALINE:  Is there any particular day of the
11    week your Honor that's better for the Court?
12              THE COURT:  Well, I will not be involved, but
13    people, typically, prefer to go in on Friday because it's not
14    as busy for the transportation people.
15              MR. MALINE:  Well --
16              MR. BROOKLIER:  I think what's going to happen is I
17    think he'll be designated by then.  If he's designated, we
18    can have him --
19              THE COURT:  You can have him transported there.
20              MR. BROOKLIER:  Right to the facility.  Otherwise,
21    we'll have him here.  I would say a Friday, January 30th?
22              THE COURT:  Then the defendant shall surrender on
23    or before noon on January 30th, 2015, to the designated
24    facility.  In the absence of such designation, the defendant
25    shall report on or before the same date and time to the
```

**UNITED STATES DISTRICT COURT**

 1   United States District Court 3470 Twelfth Street, Room G-122,

 2   Riverside, California, 92501.

 3           Is there a recommendation for designation?

 4           MR. BROOKLIER:  Your Honor, only to the extent at

 5   this point that we would ask it to be close to his home as

 6   possible understanding that we're going to be working with

 7   the Bureau of Prisons given the special nature of this case

 8   and our client.

 9           THE COURT:  If you like me to recommend MDC as a

10   designation, that may be an option?

11           MR. BROOKLIER:  That would be terrific, your

12   Honor.

13           THE COURT:  Because they might be able to

14   accommodate that.  And that way he will not be with the

15   general population.

16           MR. BROOKLIER:  Thank you, your Honor.  That would

17   be great.

18           THE COURT:  The Court will recommend that the

19   Bureau of Prisons designate the Metropolitan Detention Center

20   in Los Angeles as the facility at which Mr. Barron is to

21   complete his sentence.

22           Any other issues?

23           MR. BROOKLIER:  No, your Honor.  Thank you very

24   much.

25           MR. MALINE:  Thank you.

**UNITED STATES DISTRICT COURT**

1           MR. WIDMAN:  No, your Honor.

2           THE COURT:  Thank you.

3           THE COURTROOM DEPUTY:  The Court stands in recess.

4                   (Proceedings Concluded.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1                CERTIFICATE OF OFFICIAL REPORTER

2

3

4            I, ADELE C. FRAZIER, FEDERAL OFFICIAL REALTIME

5    COURT REPORTER, IN AND FOR THE UNTIED STATES DISTRICT COURT

6    FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY

7    THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE

8    THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

9    STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

10   ABOVE-ENTITLED MATTER AND THAT THE TRANSCIPT PAGE FORMAT IS

11   IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL

12   CONFERENCE OF THE UNITED STATES.

13

14                DATED THIS 23rd DAY OF APRIL, 2015

15

16

17

18            /S/ ADELE C. FRAZIER

19            _____

20            ADELE C. FRAZIER, CSR No. 9690, CRR, RMR

21            FEDERAL OFFICIAL COURT REPORTER

22

23

24

25

**UNITED STATES DISTRICT COURT**